IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANGELO ARMENTI, JR.,                    Civil Action No.: 1:12-CV-02039-JEJ

          *Plaintiff,*

     v.                                 **JURY TRIAL DEMANDED**

RON TOMALIS, JOHN CAVANAUGH,
GUIDO PICHINI, RONALD HENRY,
Individually

          *and*

MICHAEL J. SLAVIN, both individually
and in his capacity as president of the
APSCUF local union ,

          *and*

ASSOCIATION OF PENNSYLVANIA STATE
COLLEGE AND UNIVERSITY FACULTIES,
(APSCUF) California University Local Chapter,

          *Defendants.*

## THIRD AMENDED COMPLAINT

NOW comes the Plaintiff, Angelo Armenti, Jr., by and through his undersigned counsel,

Steven M. Toprani, Esquire and the law firm of Leech, Tishman, Fuscaldo & Lampl, LLC, and

files the instant Third Amended Complaint, and in support thereof, avers as follows:

### I. INTRODUCTION

1.      Plaintiff Angelo Armenti, Jr. (hereafter "Armenti"), the former president of

California University of Pennsylvania (hereafter "Cal U"), brings this action to seek redress for

violations of his constitutional rights and statutory protections, civil conspiracy for collusive acts

of retaliation, defamation and breach of contract.

2. As a twenty-year veteran administrator, Armenti was until his termination the longest-tenured president in the Pennsylvania State System of Higher Education (hereafter "PASSHE") which operates Pennsylvania's fourteen state-owned universities.

3. During recent years, Armenti grew concerned about Pennsylvania's steep reductions in funding to PASSHE and decisions by the Board of Governors regarding tuition rates.

4. Armenti was critical of political decisions of the Board that caused budgetary constraints that placed an increased burden on each member university and ultimately the students. Armenti expressed his criticism in papers, opinion pieces and public addresses.

5. His views were publicized as part of the national dialogue on the funding of public higher education. After noting the thirty-year decline in public support for public higher education in Pennsylvania—with no apparent plan for their survival—Armenti described this situation by saying Cal U and the other PASSHE universities were being "privatized without a plan."

6. His commentary came with a cost; Armenti fell out of favor with PASSHE's Chancellor and Board of Governors as a result. As a direct result of his speech regarding a matter of public concern – the continual devaluation of public higher education in policy and financing – the Defendants conspired to retaliate against Armenti.

7. Defendants engaged in a campaign to discredit Armenti and to create a public basis for his termination. PASSHE's retaliation began with an illegal directive issued by the Chancellor significantly restricting Armenti's ability to govern Cal U and undermining his leadership in an effort to cause unrest on the Cal U campus. PASSHE concluded with a

campaign to defame Armenti as a means to mislead PASSHE officials in order to foster support for his termination.

8.     As a result, Armenti filed a "Whistleblower" complaint against the Chancellor with the Board of Governors.   However, none of Armenti's complaints were adjudicated. Instead, Armenti's pending performance review was improperly suspended and he was eventually fired without notice or cause in a process fraught with procedural, statutory and constitutional defects.

9.     Defendants, acting collectively, vilified Armenti among his peers, defamed him in the public eye and ultimately terminated him wrongfully; all because Armenti filed a "Whistleblower" complaint and made comments on matters of public concern.

10.     Defendants' conduct was unjustified and violated Armenti's rights under the U.S. Constitution, namely the First Amendment's protection of free speech on m atters of public concern and under the Fourteenth Amendment's due process protections.  Defendants deprived Armenti of his rights under Pennsylvania's Whistleblower law.  *See*, 43 P.S. § 1421 (2007). Defendants caused permanent and irreparable harm to Armenti's reputation.  Finally, Defendants breached Armenti's employment contract.

11.     Armenti seeks a declaratory judgment that his civil rights were violated by PASSHE and its officials; an injunction requiring that his termination be rescinded and appropriate monetary damages in compensation, and reasonable attorney fees and costs.

## II.   JURISDICTION

12.     This action arises under the First and Fourteenth Amendments to the Constitution of the United States, and under the laws of the United States, particularly the Civil Rights Act. *See* 42 U.S.C. §§ 1983, 1988.

13.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction to decide cases and controversies rooted in alleged violations of the United States Constitution.  28 U .S.C. § 1343.  This Court has pendent jurisdiction over Plaintiff's state law claims.  28 U.S.C. § 1367.

### III.   VENUE

14.     Venue is proper in the United States District Court for the Middle District of Pennsylvania because the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b).

### IV.   PARTIES and RELATED PARTIES

15.     Plaintiff Angelo Armenti, Jr. ("Armenti"), is an adult resident of Chester County, Pennsylvania.  Armenti was employed by the Pennsylvania State System of Higher Education's Board of Governors and served as the president of California University of Pennsylvania from 1992 until 2012. A t the time of his termination, Armenti was the state's longest tenured president.

16.     The Pennsylvania State System of Higher Education ("PASSHE") is the Commonwealth agency responsible to govern the Commonwealth's fourteen public universities. It is located at Dixon University Center, Harrisburg, Dauphin County, Pennsylvania. PASSHE delegated certain duties to its Board of Governors, including those related to the employment of university presidents, and the action of the Board of Governors is binding upon PASSHE.

17.     The Board of Governors of PASSHE ("Board") is comprised of twenty (20) individuals and is responsible for overseeing the operation of PASSHE. By law, the Board is to establish educational, fiscal and personnel policies, appoint the chancellor and employ the university presidents.

4

18.     Defendant Ron Tomalis is the Secretary of the Department of Education. Secretary Tomalis is responsible for administering the Department of Education, implementing policies and advising the Governor relating to Tomalis serves as an *ex officio* member of the Board, and participated in the May 9 and May 25, 2012 m eetings concerning Armenti's employment.

19.     Defendant Chancellor John Cavanaugh is PASSHE's chief executive and is responsible for the day-to-day administration of PASSHE.

20.     Defendant Chairman of the Board Guido Pichini presided over the Board at all times relevant herein.

21.     Defendant Marie Conley is Vice Chair of the Board and assisted in conducting the proceedings at issue in the action.

22.     Defendant Ronald Henry is a member of the Board and serves as the Chair of the Board's Audit Committee.  Defendant Henry managed the audit process subject to this action.

23.     Defendant Michael Slavin is a professor at California University and serves as the local president of the Association of Pennsylvania State College and University Faculties ("APSCUF") union which represents the university's faculty.

24.     Defendant APSCUF is the state's faculty union and operates a local chapter at California University of PA.

V.  FACTS

***Armenti's Presidential Record***

25.     Armenti was president of Cal U for twenty years.  During his tenure, he demonstrated exemplary and distinguished service and was an opinion leader within PASSHE.

26.     Armenti's performance was recognized by the Board of Governors through unanimous votes for contract extension each time except for 2012.

27.     Armenti enjoyed a stellar reputation within the higher education community and the general public.  Armenti served a four-year term as Chairman of the PASSHE Commission of Presidents.

28.     Under Armenti's leadership, Cal U emerged as a leader among the PASSHE universities and gained a reputation as a world-class institution.  As a result of Armenti's policies Cal U increased enrollment, raised student performance and received national accreditations.

29.     Faced with reductions in state funds Armenti implemented innovative funding strategies to maintain the high quality of education at Cal U, to provide private scholarships to lower the net cost of education to students, and to modernize the campus through an improvement and revitalization program.

30.     During Armenti's tenure Cal U was transformed into one of the most attractive state universities and its enrollments grew from 7,000 to 9,500 students – reflecting a significant market share of PASSHE's students.  These improvements gave Cal U a competitive advantage among the fourteen system schools and caused consternation among some of the Board's membership.

31.     Armenti's leadership yielded other accomplishments, including the launching of the university's first and second capital campaigns which raised fifty million dollars in private funds, the adoption of university core values and a bill of rights and responsibilities, increased SAT scores and academic standards, formation of a shared governance structure, and an upgrade of the physical plant with the construction of many new buildings.

*Armenti's Employment and Governing Contract*

32.     During his tenure Armenti was employed by PASSHE as Cal U's president under the terms of a series of employment contracts. At all times relevant to this action, Armenti was employed under an "Amendment to Employment Agreement," creating a term of employment from July 1, 2010 t o June 30, 2014, w ith a prospect for an extension following a performance evaluation in 2012. *See* Employment Contract and Amendment, attached as "Exhibit A."

33.     Armenti's Performance evaluations were to be conducted annually and triennially, pursuant to Board policy "2002-03-A: *Evaluating Presidents*," Act 188 which governs PASSHE, and Armenti's employment contract with PASSHE.

34.     The "triennial review" differs from the annual review in that it is performed in a prescribed manner. Based on P laintiff's information and belief, during Armenti's twenty year tenure, the Board and PASSHE often deviated from this presidential review process. In fact, in the most recent ten years, the Board only performed five of the prior ten required annual reviews.

35.     Prior to 2012, t he Board unanimously voted in favor of Armenti's contract extension during Armenti's tenure.

36.     Armenti had no record of discipline or adverse action in his personnel file for the entirety of his twenty year tenure.

37.      Beginning in early 2012, the Board began Armenti's "triennial review process."

38.     Armenti did not anticipate any issues with his presidential review based upon his record, excellent evaluation and recommendation for extension from the Cal U Council of Trustees, and prior representations by PASSHE.

39.     While the Board was in the formal evaluation process, PASSHE actors – namely Cavanaugh, Pichini, Conley and Henry – began a course of conduct to deprive Armenti of his

contractually and statutorily required review in retaliation for Armenti's protected speech and "Whistleblower" complaint against the Chancellor.

*Armenti's Public Commentary*

40.     Beginning in 2008 and continuing for several years Armenti performed academic research into demographic trends and legislative priorities, gaining evidence that charted the decline in support and funding for public higher education in Pennsylvania.

41.     Armenti became outspoken on what he considered an unmistakable legislative trend toward the rapid privatization of public higher education.  Armenti concluded that in order to provide a high-value education in the face of budget cuts, state universities had to become more fiscally independent like private schools.  Armenti's opinions were his own and were not offered on behalf of Cal U or PASSHE, nor were they provided in furtherance of his duties as president of Cal U.

42.     Armenti authored papers and made presentations in which he, while never critical of the state's funding cuts, made observations concerning the state's changing demographic patterns together with the state's difficult financial situation.  In doing so, Armenti was sharply critical of some of PASSHE's policy decisions which undermined PASSHE's statutory mission and placed undue financial pressures on the universities and their students.

43.     Armenti spoke in opposition to PASSHE tuition-policy decisions that he felt saddled students of limited means with increasing student loan debt, but provided students with financial resources unneeded state subsidies.

44.     His speech was directed to matters of obvious and significant public importance.

45.     Armenti was invited to present his findings at national higher education conferences, including three hosted by the City University of New York, where he spoke on the

following topics: "Declining Support for Public Higher Education in Pennsylvania (2008)," "The Effect of State Budgets on Labor Relations Between Contracts (2010)," and "Public Education/Private Funding (2011)."

46.     These presentations were not well received by PASSHE and the Chancellor who disagreed with Armenti's public commentary and discouraged Armenti from presenting in such forums.

47.     As Armenti became regarded as an opinion leader on public higher education funding and policy, some of PASSHE's key leaders became concerned with Armenti's message.

48.     PASSHE's and the Chancellor's negative views of Armenti's public commentary were evidenced by actions taken to undermine Armenti's authority as president, as set forth below.

49.     Key PASSHE officials voiced displeasure with Armenti's opinions.  On one occasion, the Board's former chair, Ken Jarin, was critical of Armenti for submitting an op-ed piece to the *Pittsburgh Post-Gazette* criticizing the PASSHE's "low tuition for all" policy which Armenti argued saddled disadvantaged students with high debt and gave unneeded subsidies to wealthy students.

### *PASSHE's Retaliation*

50.     On February 7, 2012, PASSHE sent a team of three auditors and a supervisor to Cal U to perform an audit regarding unspecified allegations.

51.     Armenti was provided little information regarding the scope or subject of the audit; however, he later learned that the audit was the result of several anonymous complaints. The audit team, which administratively reported to the Chancellor, who ordered the audit, was ultimately managed by Ronald Henry, Chair of the Board's Audit Committee.

*The Chancellor's Illegal Directive Restricting Armenti's Authority*

52.     Immediately following the commencement of the audit, PASSHE began to interfere with Armenti's management of Cal U by suspending a previously planned and announced furlough plan.

53.     In the later months of 2011, Armenti had worked with PASSHE on a furlough plan as a means to control institutional costs in the face of budgetary constraints, which included a projected $7.5 million shortfall.

54.     Armenti was supported in the year-long planning phases of the manager furlough plan by the Chancellor, PASSHE legal counsel and the Board. On October 6, 2011, the Board adopted "Policy 2011-02: Nonrepresented Employee Severance Program," which facilitated the furloughs.

55.     Armenti announced the furlough plan on January 24, 2012 at the Faculty Convocation held at Cal U. As part of the plan, Armenti was to furlough ten non-union managers as a cost-savings measure. The furlough plan was initially reported by Cal U's internal newspaper, *The California Journal*, on February 6, 2012.

56.     On February 8, 2012, despite the previous arrangement with PASSHE, Vice Chancellor Gary Dent contacted Armenti and related that certain members of the Board, specifically Marie Conley, were concerned with Cal U's plan to furlough managers as scheduled in the next two days.

57.     Dent related to Armenti that he was "getting calls about the plan" and that it "was causing concern among PASSHE's Board because of the timing."

58.     Earlier in the day on February 8, 2012, two newspapers conflated two front page stories, one outlining Governor Corbett's budget announcement on February 7, 2012 which cut

twenty percent of PASSHE's operational budget, and the second reporting on Cal U's plan to furlough ten managers. The two stories were positioned as if they were directly related.

59.     Armenti's announcement of the furlough plan occurred two weeks before the Governor's budget address.

60.     Dent stated to Armenti that "I don't think you should go forward" because the furlough had the public appearance of being in response to the Governor's announced budget cuts to PASSHE.

61.     Also on February 8, 2012, Armenti responded to Dent, notifying the Chancellor's office that unless he received something in writing directing him not to implement the planned furloughs, he would proceed as PASSHE had authorized the plan. Later that day, Armenti received an email from the Chancellor mandating that "after consultation with the Board, I am verifying that you are to take no personnel action without explicit approval from me or my staff until further notice."

62.     The Chancellor had no good faith basis for issuing the directive suspending the announced furlough.

### *Armenti's Whistleblower Complaint*

63.     In response to the Chancellor's furlough directive, Armenti submitted a formal complaint against the Chancellor to the Board that raised issues of abuse and mismanagement by the Chancellor, and acts of suppression of and retaliation for Armenti's speech.

64.     On March 21, 2012, Armenti filed the formal complaint with the Board.

65.     Armenti made the complaint in good faith and with a reasonable basis to believe that he had information that the Chancellor issued illegal or improperly motivated directives.

66. On March 21, 2012, Armenti contacted Chairman Pichini to schedule a meeting to discuss the formal complaint.

67. On March 23, 2012, A rmenti and Cal U Trustee Chair Robert Irey attended a meeting with PASSHE officials to address the formal complaint. Among those in attendance were PASSHE chief counsel Leo Pandeladis, Chair Pichini, and Vice Chair Conley.

68. During the meeting on M arch 23, 2012, P andeladis indicated that PASSHE appointed a special investigator to review Armenti's complaint. A rmenti was encouraged to provide information to the "investigation."

69. Armenti was not contacted concerning the investigation until early May, just a few days before his firing. Armenti believes, and therefore avers, that PASSHE had no intention of addressing the substance of his "Whistleblower" complaint.

70. On May 8, 2012, A rmenti provided the appointed special investigator with additional complaints regarding the Chancellor's continued conduct. The special investigator took no action, requested no supporting information, and provided no reasonable opportunity to advance the claims.

### PASSHE's Retaliation for Armenti's Whistleblower Complaint

71. Also during the meeting on M arch 23, 2012, V ice Chair Conley stated that the Board had cancelled Armenti's contract evaluation and triennial review, suggesting that it "could not go forward" because he "filed a complaint against Chancellor Cavanaugh."

72. Upon receipt of that information Armenti complained to Conley that "this action sounds like retaliation for having filed a complaint." Conley tacitly admitted Armenti's claim of retaliation. The decision to table his contract review, the precursor event that led to his termination, was in direct response to his "Whistleblower" complaint.

73.     Conley apparently made the unilateral decision as chair of the HR Committee of the Board and without full Board authorization and acted outside the scope of her authority.

74.     The Board's cancellation of the evaluation process was in retaliation for Armenti's complaint which was protected under Pennsylvania's "Whistleblower" law.     *See 43 P.S. § 1421* (2007).

75.     The Board failed to complete the review as required by its policies for evaluating presidents.

76.     PASSHE has since refused to provide Armenti with any information relating to its evaluation of his performance prior to the time of cancellation.

### *PASSHE's Audit Report as Pretext*

77.     On February 9, 2012, Dean Weber, PASSHE's chief auditor, concluded the audit and gave an exit interview with Armenti and other Cal U administrators. Weber, speaking on behalf of PASSHE, indicated that the most serious finding concerned "employees attending expensive conferences." The exit interview made no reference to fiscal malfeasance of any kind.

78.     On March 8, 2012, Chancellor Cavanaugh met with Armenti and Cal U Trustee Chair Robert Irey for three hours as part of Armenti's annual performance evaluation. During the meeting, the Chancellor did not mention the recently concluded audit.

79.     During the review meeting, Chair Irey conveyed the Trustees' position that Armenti's contract should be extended. The Chancellor offered no indication that there were any issues with Armenti's performance, but did allude to Irey, outside of Armenti's presence, that Irey "didn't know the whole story."

80.     Defendants Cavanaugh, Pichini, Tomalis, Henry and Conley utilized the investigative audit report to discredit Armenti's stellar record and to gain the support necessary

to cause his termination at upcoming meetings concerning Armenti's employment. On information and belief, the audit figured prominently in the meetings in which the Board – or committees of the Board – deliberated on Armenti's termination.

81.     Toward that end, PASSHE released the confidential audit to the public.

82.     On March 18, 2012, *The Observer Reporter* newspaper published an article entitled "Cal U Finances Under Investigation," wherein PASSHE spokesman Kenn Marshall confirmed the existence of the audit and announced its future public release "once the investigation is completed."

83.     On March 20, 2012, PASSHE circulated the audit internally. PASSHE did not provide Armenti with an opportunity to respond, as is a generally accepted audit practice and supported by PASSHE policies which created a fair process by which facts are discoverable. Specifically, PASSHE's audit violated "Policy 1991-06-1," "Administrative Directive 1991-06.01 on Investigations," and the Code of Ethics for Internal Auditors that PASSHE auditors must follow. PASSHE's audit violated Armenti's procedural due process rights.

84.     On April 3, 2012, concerned that the "Final Audit Report" was released internally without commentary from Cal U, Armenti registered an objection and response, although not requested by PASSHE, to Chair Pichini and the Audit Committee, and never received a response.

85.     PASSHE had not provided Armenti with any meaningful opportunity to respond to the audit report prior to its release either internally or to the public.

86.     The audit was intended to create the pretext for Armenti's firing.

*Rumblings of Armenti's Pending Termination*

87.     On April 2, 2012, as Armenti returned from making a presentation at a national conference in New York City, he received telephone calls indicating that he was "in trouble with Governor Corbett for intruding on his budget message."

88.     On April 4, 2012, Armenti attended a Board meeting in Harrisburg. While driving there, he received multiple telephone calls indicating that "there were rumors all over campus that he would step down or be fired by the end of the week." On Plaintiff's information and belief, PASSHE circulated rumors of Armenti's firing to further disrupt Cal U's campus and weaken Armenti's position with the public and the full Board.

89.     Later on April 4, 2012, rumors of Armenti's pending termination spread on Cal U's campus. In fact, the local APSCUF union chapter – which represents the faculty – by its president, Dr. Michael Slavin, announced to a departmental meeting that "Armenti will be forced to step down or be fired by the end of the week." Dr. Slavin repeated that message to a meeting of Cal U coaches.

90.     On April 5, 2012, a *Tribune Review* reporter who attended the Board's first day meeting in Harrisburg confronted Armenti and asked if "he could confirm the Board's plan to demand his resignation." Armenti denied the claim as he received no such request from the Board.

91.     Also on April 5, 2012, Slavin faxed a 17-page document on APSCUF letterhead to the Board, Chancellor and Cal U Trustees entitled "Reasons for No Deal," in which he published false statements about Armenti's management of Cal U. APSCUF distributed the document to all Cal U faculty, coaches, managers and the media. Upon Plaintiff's information

and belief, APSCUF circulated this "manifesto" for the purpose of causing PASSHE to terminate Armenti's employment.

92.     APSCUF's "Reasons for No Deal" contained false allegations concerning the manner in which Armenti governed the campus, and included, but was not limited to, false claims that Armenti prohibited Slavin from access to Cal U's financial records for use during collective bargaining activity.   In fact, Armenti provided access to Slavin by computer, and records show that Slavin did not avail himself of the opportunity.

93.     Armenti drafted a response to APSCUF's document and emailed it to Pichini. PASSHE provided no response or acknowledgement of Armenti's rebuttal.   Pichini concealed the response and did not share it with the Board.

94.     Multiple newspapers printed portions of APSCUF's false statements, and again, PASSHE provided no response to contradict the false claims.

95.     On April 6, 2012, Cal U Trustee Larry Maggi contacted Armenti and related that a reporter for the *Observer-Reporter* called and inquired "if Armenti stepped down or had been fired that day."   The reporter, Scott Beveridge, was a fellow alumnus and longtime friend of Kenn Marshall, PASSHE's media spokesman.   On Plaintiff's information and belief, PASSHE "leaked" information to the media concerning their plan to terminate Armenti.

96.     On May 4, 2012, PASSHE published notice of a special meeting of the Board to be held on May 9, 2012 and to "discuss personnel matters."   This vague notice made no reference to Armenti, who was provided no notice that the meeting concerned his employment.

97.     Despite the rumors, Armenti had no reason to believe that legitimate cause existed to terminate his employment.

*Armenti's Wrongful Termination*

98.     On May 9, 2012, at the direction of Chairman Pichini, the Board convened a closed-door, four hour meeting, lacking a quorum, purportedly of the "Executive Committee" that authorized Pichini, by an unrecorded vote, to "take whatever action necessary with Armenti." Upon information and belief, the meeting was arranged by Pichini, Cavanaugh and Conley.

99.     On May 10, 2012, PASSHE's legal counsel, Pandeladis, telephoned Armenti and advised that pursuant to a Right to Know Request filed by a local newspaper, PASSHE intended to release the internal audit by the close of business. Armenti indicated to Pandeladis that he would provide his "rebuttal to the audit" to PASSHE for release at that time.

100.    Shortly thereafter, Pandeladis called a second time and informed Armenti that PASSHE declined the Right to Know Request and decided to withhold the audit report. Upon information and belief, PASSHE did not comply with the Request in order to suppress Armenti's response to the flawed audit report.

101.    On May 16, 2012, Chairman Pichini met with Armenti at the Dixon Center in Harrisburg where he demanded Armenti's retirement.

102.    Armenti refused to retire.

103.    Pichini stated that Armenti had to retire or face termination.

104.    Pichini then informed Armenti that he was "terminated because of turmoil on the Cal U campus" and provided a brief termination letter.

105.    The "turmoil" referenced by Pichini was manufactured by the collective acts of PASSHE's defendants, Cavanaugh, Pichini, Conley, Henry and Tomalis.

106.     Armenti was then informed by Pandeladis that the Board exercised its option to terminate his contract "without cause."

107.     On May 25, 2012, the Board convened a telephone meeting to ratify the Executive Committee's authorization to terminate President Armenti. This meeting lacked the required roll-call vote and otherwise violated the Board's bylaws and policies.

108.     On June 1, 2012, Chairman Pichini sent a letter to Armenti advising that he was terminated "for cause." The letter was released to the awaiting media.

109.     Pichini's "for cause" letter followed the out of court settlement of an injunction in Washington County Common Pleas Court, seeking emergency relief from the PASSHE mandate that prevented Armenti from accessing his office and files.

110.     Prior to the commencement of that action, Armenti was informed by PASSHE that should he institute any legal proceedings, his termination would be deemed "for cause."

111.     At no time following the June 1, 2012 letter has PASSHE provided any basis for Armenti's termination. Recently, Pichini indicated to Cal U Trustee Chair Irey that the firing was "not for cause."

### PASSHE's Audit as Pretext for Armenti's Firing

112.     On May 17, 2012, P ASSHE released the internal audit report to the statewide-media while withholding Armenti's rebuttal. The audit report alleged, inter alia, that Armenti engaged in "unlawful acts" equivalent to "money laundering."

113.     Because Armenti was prohibited from accessing his office or his electronic files, he was unable to distribute his response to the audit.

114.     PASSHE was thus successful in releasing the audit while suppressing Armenti's response.

115.    PASSHE deliberately withheld the audit report from release until after his termination for the purpose of using the audit as a basis to further defame Armenti's reputation while providing the public with an apparent basis for his termination the day before.

116.    Plaintiff believes and avers that PASSHE and its officials named herein conspired with a third party, the auditor selected by Audit Chair Ron Henry, and authorized by Cavanaugh and Pichini, to create a document to falsely accuse Armenti of misconduct and to further generate a report for use as a pretext to his termination, and to diminish his reputation and place him in a false light.

### *Summary of Defendants Actions*

117.    Defendants engaged in a course of conduct to deny Armenti his rights protected by the US Constitution and Pennsylvania law: namely his First Amendment right to free speech without retaliation; his Fourteenth Amendment to procedural due process; his rights under Pennsylvania's Whistleblower law; his rights to reputation under the Pennsylvania constitution and common law; and lastly his contractual rights.

118.    PASSHE officials, including the defendants, engaged in a course of conduct aimed at diminishing Armenti's professional reputation, stature among the system's presidents and standing in the community.  In short, PASSHE's release of the audit and concealment of his response caused the false public appearance that Armenti was terminated for malfeasance.

119.    Defendants utilized the audit to create the false impression to the public that Armenti mismanaged Cal U's finances.

120.    Defendants perpetuated this falsehood when certain PASSHE officials accused Armenti of illegal conduct, with one Board member even stating to a state legislator, who was acting in oversight and seeking information relative to the audit report, that Armenti was the

target of an FBI criminal investigation. PASSHE communicated that statement to cast the specter of criminal or illegal conduct upon Plaintiff and to discourage the legislator from initiating oversight or scrutiny.

121. PASSHE perpetuated the false impression that Armenti was fired for misconduct, malfeasance or criminal conduct.

122. PASSHE has continued to provide no e xplanation for Armenti's abrupt termination to the plaintiff, Cal U Council of Trustees, media or the public, and has taken no affirmative acts to remediate the harm caused by Defendants' unfounded and unsupported allegations of criminal conduct made publicly as against Plaintiff.

123. PASSHE opted not to complete Armenti's triennial review and instead terminated his employment without proper process, notice or cause, and in retaliation for comments critical of PASSHE and Board policy decisions, and the reporting of improper conduct by the Chancellor.

124. The decision to terminate Armenti would not have occurred in the absence of his protected speech relating to public higher education financing.

125. Armenti would not have been terminated absent his protected report of illegal activity under Pennsylvania Whistleblower laws.

126. Armenti's termination, the release of the audit report and the false allegations of criminal conduct, have caused him embarrassment, humiliation, as well as irreparable damage to his reputation.

## VI.    CLAIMS

**Count One – First Amendment Retaliation: Violation of Plaintiff's Rights Under**

**42 U.S.C. § 1983:**

**Angelo Armenti v. Secretary Tomalis, Chancellor Cavanaugh, Chair Pichini, Vice Chair Conley, Ronald Henry, in their individual capacities.**

127.    Paragraphs 1 through 126 are incorporated by reference as if set forth fully.

128.    Plaintiff Armenti, a public employee, engaged in First Amendment protected free speech on matters of public importance, by providing commentary on PASHE policies and practices in relation to public higher education.  Plaintiff's protected speech was a substantial factor for Defendants' retaliation.  Defendants issued illegal directives against the plaintiff and ultimately caused his termination in retaliation for his protected speech

129.    At the time Plaintiff made the statements referenced *supra* at ¶¶ 40 – 49, 87, Plaintiff was speaking as a citizen of the Commonwealth and United States.

130.    Plaintiff's statements referenced *supra* at ¶¶40 – 49, 87, regarded matters of public concern.

131.    PASSHE or the individual defendants did not have an adequate justification or reason for treating Plaintiff differently than any other member of the public for making the statements referenced *supra* at ¶¶40 – 49, 87.

132.    Plaintiff's speech acts referenced *supra* at ¶¶ 40 – 49, 87 were a substantial factor in Defendants' termination of Plaintiff's employment.

**Count Two – Violation of Plaintiff's Due Process Rights Under 42 U.S.C. § 1983: Violation**

**of Liberty Interest in Reputation by Failing to Provide a Name-Clearing Hearing**

**Angelo Armenti v. Secretary Tomalis, Chancellor Cavanaugh, Chair Pichini, Vice Chair Conley, Ronald Henry, in their individual capacities.**

133.    Paragraphs1 through 132 are incorporated by reference as if set forth fully.

134.    Defendants have not provided Plaintiff with a public hearing at which he could answer the reasons – as vague and insincere as they still are – for his termination.

135.    At various points, Defendants have stated or implied that Plaintiff acted dishonestly and/or unlawfully as President of California University of Pennsylvania.

136.    Defendants have not yet provided a definitive answer to whether Plaintiff was terminated with or without cause, having told Plaintiff, media outlets, and other individuals inconsistent reasons for Plaintiff's termination.

137.    The allegations and insinuations of dishonest, unethical, and/or illegal conduct, coupled with inconsistency in the statements surrounding Plaintiff's termination has severely stigmatized Plaintiff's personal and professional reputations.

138.    Defendants have retaliated against Plaintiff's exercise of his First Amendment freedom of speech rights as alleged in Count I *supra*.

139.    Defendants' continued failure to provide Plaintiff with notice of a public hearing at which he would have an opportunity to be heard regarding his termination has prevented Plaintiff from publicly clearing his name and reputation.

**Count Three – Civil Conspiracy to Violate Constitutional Rights**

**Angelo Armenti v. Secretary Tomalis, Chancellor Cavanaugh, Chair Pichini, Vice Chair Conley, Ronald Henry, in their individual capacities.**

140.    Paragraphs 1 through 139 are incorporated by reference as if set forth fully.

141. Defendants engaged in a civil conspiracy to defame plaintiff and substantially impair or circumvent his constitutional rights and statutory protections.

142. There existed a conspiracy involving state action, particularly the suspension of Armenti's review and termination without due process, and Defendants deprived Armenti's civil rights in furtherance of the conspiracy; Plaintiff suffered resulting harm.

## Count Four – Violation of Pennsylvania's Whistleblower law

**Angelo Armenti v. Chair Pichini and Vice Chair Conley, in their individual capacities**

143. Paragraphs 1 through 142 are incorporated by reference as if set forth fully.

144. Pennsylvania's Whistleblower law prohibits retaliation, including discharge, against public employees who report instances of wrongdoing to appropriate authorities.

145. Plaintiff Armenti made a "Whistleblower" complaint against Defendant Chancellor Cavanaugh to the appropriate authority, Defendant Chair Pichini and Board of Governors, and the defendants named in his count retaliated against Plaintiff by causing his termination.

146. Plaintiff raised serious allegations of improper conduct and wrongdoing against the Chancellor. Plaintiff's allegations against the Chancellor are within the scope of Pennsylvania's Whistleblower Act, in that they involve abuses of power, fiscal mismanagement, and violations of policy and law, including the First Amendment retaliation claims.

147. Despite assigning an independent investigator to review the complaint, PASSHE took no material steps to address the merits of complaint. Plaintiff avers that PASSHE never intended to investigate the complaint, and that its actions were a sham.

148.    Suspension or cancellation of Armenti's requisite contract review was  a tacit threat to Plaintiff to withdraw the Whistleblower Complaint or face adverse consequences in his employment.

149.    Armenti's termination was retaliatory.

150.    Defendants' statement to Plaintiff that his firing status would be "for cause" if Plaintiff instituted legal actions related to his termination constitutes a *de facto* threat to Plaintiff of adverse consequences for filing his Whistleblower Complaint, because Defendants knew that Plaintiff would repeat many or most of the Whistleblower Complaint's allegations in any legal action, *e.g.* the First Amendment retaliation claim.

151.    Although the exact status of Plaintiff's termination is unclear, Defendants' statements to the press that Plaintiff was fired "for cause" constitutes retaliation for Plaintiff's filing of the Whistleblower Complaint.

152.    But for the Whistleblower complaint, Defendants would not have suspended Armenti's contract review nor would he have been terminated, purportedly "for cause."

## Count Five – Defamation

**Angelo Armenti v. John Cavanaugh, Guido Pichini, Ronald Henry, individually.**

153.    Paragraphs 1 through 152 are incorporated by reference as if set forth fully.

154.    Defendants' individual conduct defamed plaintiff's reputation.

155.    Upon information and belief, Defendants acted individually, for the following reasons:

a.  On March 18, 2012, PASSHE spokesman Kenn Marshall confirmed only that an audit was in progress and that it would only be released to the public "once the investigation is completed" (*supra* ¶ 82).

b.  PASSHE released the audit report to the public on May 17, 2012, and through news reports PASSHE created the appearance that the audit was the basis for the Board's action to authorize Armenti's termination.

c.  Between March 18, 2012 and May 17, 2102, numerous individuals within the Cal U community (*e.g.* university administrators, APSCUF members and officials, teaching faculty, and other employees) and Pennsylvania media made statements or published stories that reflected familiarity with the audit report's defamatory allegations and findings, which those individuals only could have been able to make or publish with information disclosed to them individually by PASSHE officials with knowledge of the audit, *i.e.* Defendants.

d.  Defendants were PASSHE officials with knowledge of the audit report's allegations, auditor's investigation, and the report's draft findings at all times prior to the report being made public.

e.  Therefore, it is reasonable to conclude, and therefore averred upon information and belief, that Defendants selectively leaked information to the public, *i.e.* members of the Cal U community and Pennsylvania media outlets, prior to the audit report's May 17, 2012, release to the public.

f.  Because it was PASSHE's stated policy that it would not discuss with or disclose to the public the specific allegations or findings of the audit report prior to its official release, it is reasonable to conclude, and therefore averred upon information and belief, that Defendants disseminated the audit report's allegations and findings to individuals within the Cal U community and Pennsylvania media outlets, in their individual, and not official capacity.

156.  Defendants issued an audit report that was defamatory in nature in that it contained false and inflammatory allegations of illegal conduct on the part of the Plaintiff.

157.    Defendants published the audit with false information.

158.    The audit containing false information applied directly to the Plaintiff.

159.    In drafting and adopting a report containing false information, and later publishing it, Defendants abused any privilege that may have existed.

160.    The publically audit is viewed as false to the recipient and creates the public impression that Plaintiff engaged in illegal conduct.

161.    Defendants knew that the information was false; yet they authorized the report's publication to the media and release to the public.

162.    In fact, Plaintiff placed PASSHE and its officials on notice via email of April 3, 2012 that the report contained false accusation of "money laundering" and "unlawful conduct" by Armenti; Plaintiff accordingly presented PASSHE with a six-page rebuttal on April 14, 2012, which PASSHE and its defendants disregarded.

163.    Despite having six weeks to review or otherwise incorporate Plaintiff's written response to the audit report, Defendants refused to consider Armenti's rebuttal to the report and took affirmative steps to conceal or repress its release to the Board, all prior to the public release of the audit report.

164.    The Plaintiff was caused special harm by the defamatory audit in that it caused him reputational harm and termination from employment. PASSHE and its official defendants released the audit report the day following Plaintiff's termination, causing multiple unfavorable media stories that parroted the false information.  PASSHE and its defendants released the audit in an effort to further damage Plaintiff's reputation and to justify their action in terminating his employment.

165. Defendants caused Plaintiff embarrassment, humiliation, as well as irreparable damage to his reputation.

## Count Six – Defamation

### Angelo Armenti v. Michael Slavin, APSCUF Local

166. Paragraphs 1 through 165 are incorporated by reference as if set forth fully.

167. Defendants conduct defamed plaintiff's reputation.

168. Defendants drafted and published a manifesto entitled "Reasons for No Deal" which contained false statements, applicable to Plaintiff. D efendants published the false statements to Plaintiff's employer as well as to the public at large.

169. Defendants in this count created and supplied the APSCUF document "Reasons for No Deal" as containing false information so as to cause Plaintiff's termination from employment.

170. As discernible from the title of the manifesto, "Reasons for No Deal," Defendant Slavin evidences the motive and specific intent to maliciously harm Plaintiff's reputation with both his employer and the public. In fact, it was released to the media at the time of its issuance to PASSHE.

171. The surreptitious dissemination of the "Reasons for No Deal" letter to third parties, including the media, strips it of any purported privilege and exposes the drafter, and publisher, to liability.

172. Defendant Slavin, acting apparently on t he union's behalf, published the false statements with actual malice, and had no privilege to do so. In fact, neither APSCUF nor the local APSCUF president is afforded any input in the presidential evaluation process, as governed by state law.

173.    Defendant Slavin falsely accused Plaintiff of denying the union access to financial records required to be accessible to the public.  Additionally, Slavin falsely accused Plaintiff of taking retaliatory action by wrongfully terminating employees for personal reasons.

174.    Defendant Slavin, and APSCUF by adoption of his letter, had no privileged occasion to publish the same. In the alternative, Defendants abused any privilege by acting with actual malice and by publishing the document to third parties, including the campus community, public and the media in violation of any privilege that may have existed.

175.    Plaintiff suffered reputational harm.

176.    Defendant Slavin has a history of denigrating Armenti to the faculty and the public by making false and misleading accusations against him, calling Plaintiff "obsessed," "brutal" and "mistrusting."

177.    Defendant Slavin has by past conduct and by these actionable statements displayed a bias or animus against Plaintiff.

178.    Defendant Slavin's bias is merely an extension and continuation of a bias or animus that existed by APSCUF and its prior three local chapter presidents and comprised a period of nearly twenty years.

179.    For many years, APSCUF publicly denigrated Plaintiff and caused him reputational harm. Upon information and belief, a former state-wide APSCUF president described the union's activities of denigrating Plaintiff personally as a "full, frontal assault on Armenti."

180.    Defendants caused Plaintiff embarrassment, humiliation, as well as irreparable damage to his reputation.

## Count Seven – Tortious Interference With Contractual Relationship

### Angelo Armenti v. Michael Slavin, APSCUF Local Union

181.    Paragraphs 1 through 180 are incorporated by reference as if set forth fully.

182.    Plaintiff had a contractual relationship with PASSHE and the Board of Governors that specified his employment for a fixed durational term.

183.    Defendants in this count engaged in purposeful conduct by drafting and providing a document entitled "Reasons for No Deal" to a third party, here PASSHE and its officials, with the specific intent to harm the existing contractual relationship.

184.    Defendants had no privilege or justification in doing so, since APSCUF has no involvement in Armenti's employment review by law.  Applicable policy provides no special placement for commentary or other participation by the APSCUF union.

185.    Plaintiff believes and therefore avers that PASSHE and its defendant officials relied upon the Slavin "Reasons for No Deal" and its false allegations as a basis for terminating Plaintiff.  Plaintiff believes and avers that the "Reasons for No Deal" letter was parcel of the "turmoil on campus" that was the purported basis for his termination.

186.    Plaintiff suffered actual damages as he was terminated from employment.

## VII.    RELIEF

On the basis of the foregoing, Plaintiff Angelo Armenti, Jr. requests the following:

1.  Awards of compensatory damages against the respective defendants;

2.  Awards of punitive damages against the respective defendants;

3.  The award of reasonable attorney's fees, costs of litigation and expenses ;

4.  The equitable award of a name-clearing hearing; and

5.  Any further relief that is warranted.

Dated: October 17, 2013                                  Respectfully submitted,

                                                         */s/ Steven M. Toprani*
                                                         Steven M. Toprani
                                                         PA ID No. 93217

                                                         Leech Tishman Fuscaldo & Lampl
                                                         525 William Penn Place, 28th Fl.
                                                         Pittsburgh, PA 15219
                                                         412.261.1600

                                                         *Attorney for Plaintiff*